Justice Scalia,
with whom Chief Justice Roberts and Justice Thomas join,
dissenting.
The Court concludes that the Attorney General lacked authority to declare assisted suicide illicit under the Controlled Substances Act (CSA), because the CSA is concerned only with “illicit drug dealing and trafficking,” ante, at 270 (emphasis added). This question-begging conclusion is obscured by a flurry of arguments that distort the statute and disregard settled principles of our interpretive jurisprudence.
Contrary to the Court’s analysis, this case involves not one but three independently sufficient grounds for reversing the Ninth Circuit’s judgment. First, the Attorney General’s interpretation of “legitimate medical purpose” in 21 CFR §1306.04 (2005) (hereinafter Regulation) is clearly valid, given the substantial deference we must accord it under Auer v. Robbins, 519 U. S. 452, 461 (1997), and his two remaining conclusions follow naturally from this interpretation. See Part I, infra. Second, even if this interpretation of the Regulation is entitled to lesser deference or no defer *276 ence at all, it is by far the most natural interpretation of the Regulation — whose validity is not challenged here. This interpretation is thus correct even upon de novo review. See Part II, infra. Third, even if that interpretation of the Regulation were incorrect, the Attorney General’s independent interpretation of the statutory phrase “public interest” in 21 U. S. C. §§ 824(a) and 823(f), and his implicit interpretation of the statutory phrase “public health and safety” in § 823(f)(5), are entitled to deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984), and they are valid under Chevron. See Part III, infra. For these reasons, I respectfully dissent.
HH
The Interpretive Rule issued by the Attorney General (hereinafter Directive) provides in relevant part as follows:
“For the reasons set forth in the OLC Opinion, I hereby determine that assisting suicide is not a legitimate medical purpose’ within the meaning of 21 CFR § 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the CSA. Such conduct by a physician registered to dispense controlled substances may ‘render his registration . . . inconsistent with the public interest’ and therefore subject to possible suspension or revocation under 21 U. S. C. [§] 824(a)(4).” 66 Fed. Reg. 56608 (2001).
The Directive thus purports to do three distinct things: (1) to interpret the phrase “legitimate medical purpose” in the Regulation to exclude physician-assisted suicide; (2) to determine that prescribing, dispensing, and administering federally controlled substances to assist suicide violates the CSA; and (3) to determine that participating in physician-assisted suicide may render a practitioner’s registration “inconsistent with the public interest” within the meaning of 21 U. S. C. §§ 823(f) and 824(a)(4) (which incorporates § 823(f) by refer *277 ence). The Court’s analysis suffers from an unremitting failure to distinguish among these distinct propositions in the Directive.
As an initial matter, the validity of the Regulation’s interpretation of “prescription” in §829 to require a “legitimate medical purpose” is not at issue. Respondents conceded the validity of this interpretation in the lower court, see Oregon v. Ashcroft, 368 F. 3d 1118, 1133 (CA9 2004), and they have not challenged it here. By its assertion that the Regulation merely restates the statutory standard of 21 U. S. C. § 830(b)(3)(A)(ii), see ante, at 257, the Court likewise accepts that the “legitimate medical purpose” interpretation for prescriptions is proper. See also ante, at 258 (referring to “legitimate medical purpose” as a “statutory phrase”). It is beyond dispute, then, that a “prescription” under § 829 must issue for a “legitimate medical purpose.”
A
Because the Regulation was promulgated by the Attorney General, and because the Directive purported to interpret the language of the Regulation, see 66 Fed. Reg. 56608, this case calls for the straightforward application of our rule that an agency’s interpretation of its own regulations is “controlling unless plainly erroneous or inconsistent with the regulation.” Auer, supra, at 461 (internal quotation marks omitted). The Court reasons that Auer is inapplicable because the Regulation “does little more than restate the terms of the statute itself.” Ante, at 257. “Simply put,” the Court asserts, “the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute.” Ibid.
To begin with, it is doubtful that any such exception to the Auer rule exists. The Court cites no authority for it, because there is none. To the contrary, our unanimous decision in Auer makes clear that broadly drawn regulations are entitled to no less respect than narrow ones. “A rule requir *278 ing the Secretary to construe his own regulations narrowly would make little sense, since he is free to write the regulations as broadly as he wishes, subject only to the limits imposed by the statute.” 519 U. S., at 463 (emphasis added).
Even if there were an antiparroting canon, however, it would have no application here. The Court’s description of 21 CFR § 1306.04 (2005) as a regulation that merely “paraphrase[s] the statutory language,” ante, at 257, is demonstrably false. In relevant part, the Regulation interprets the word “prescription” as it appears in 21 U. S. C. §829, which governs the dispensation of controlled substances other than those on Schedule I (which may not be dispensed at all). Entitled “[prescriptions,” § 829 requires, with certain exceptions not relevant here, “the written prescription of a practitioner” (usually a medical doctor) for the dispensation of Schedule II substances (§ 829(a)), “a written or oral prescription” for substances on Schedules III and IV (§ 829(b)), and no prescription but merely a “medical purpose” for the dispensation of Schedule V substances (§ 829(c)).
As used in this section, “prescription” is susceptible of at least three reasonable interpretations. First, it might mean any oral or written direction of a practitioner for the dispensation of drugs. See United States v. Moore, 423 U. S. 122, 137, n. 13 (1975) (“On its face §829 addresses only the form that a prescription must take.... [Section] 829 by its terms does not limit the authority of a practitioner”). Second, in light of the requirement of a “medical purpose” for the dispensation of Schedule V substances, see § 829(c), it might mean a practitioner’s oral or written direction for the dispensation of drugs that the practitioner believes to be for a legitimate medical purpose. See Webster’s New International Dictionary 1954 (2d ed. 1950) (hereinafter Webster’s Second) (defining “prescription” as “[a] written direction for the preparation and use of a medicine”)', id., at 1527 (defining “medicine” as “[a]ny substance or preparation used in treating disease”) (emphasis added). Finally, “prescription” might *279 refer to a practitioner’s direction for the dispensation of drugs that serves an objectively legitimate medical purpose, regardless of the practitioner’s subjective judgment about the legitimacy of the anticipated use. See ibid.
The Regulation at issue constricts or clarifies the statute by adopting the last and narrowest of these three possible interpretations of the undefined statutory term: “A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose . . . 21 CFR § 1306.04(a) (2005). We have previously acknowledged that the Regulation gives added content to the text of the statute: “The medical purpose requirement explicit in subsection (c) [of §829] could be implicit in subsections (a) and (b). Regulation § [1]306.04 makes it explicit.” Moore, supra, at 137, n. 13.[1]
The Court points out that the Regulation adopts some of the phrasing employed in unrelated sections of the statute. See ante, at 257. This is irrelevant. A regulation that significantly clarifies the meaning of an otherwise ambiguous statutory provision is not a “parroting” regulation, regardless of the sources that the agency draws upon for the clarification. Moreover, most of the statutory phrases that the Court cites as appearing in the Regulation, see ibid, (citing 21 U. S. C. §§ 812(b) (“ ‘currently accepted medical use’ ”), 829(c) (“ ‘medical purpose’ ”), 802(21) (“ ‘in the course of professional practice’”)), are inapposite because they do not “parrot” the only phrase in the Regulation that the Directive purported to construe. See 66 Fed. Reg. 56608 (“I hereby *280 determine that assisting suicide is not a ‘legitimate medical purpose’ within the meaning of 21 CFR § 1306.04 . . . ”). None of them includes the key word “legitimate,” which gives the most direct support to the Directive’s theory that § 829(c) presupposes a uniform federal standard of medical practice.[2]
Since the Regulation does not run afowl (so to speak) of the Court’s newly invented prohibition of “parroting”; and since the Directive represents the agency’s own interpretation of that coneededly valid regulation; the only question remaining is. whether that interpretation is “plainly erroneous or inconsistent with the regulation”; otherwise, it is “controlling.” Auer, 519 U. S., at 461 (internal quotation marks omitted). This is not a difficult question. The Directive is assuredly valid insofar as it interprets “prescription” to require a medical purpose that is “legitimate” as a matter of federal law — since that is an interpretation of “prescription” that we ourselves have adopted. Webb v. United States, 249 U. S. 96 (1919), was a prosecution under the Harrison Act of a doctor who wrote prescriptions of morphine “for the purpose of providing the user with morphine sufficient to keep him comfortable by maintaining his customary use,” id., *281 at 99 (internal quotation marks omitted). The dispositive issue in the ease was whether such authorizations were “prescriptions” within the meaning of § 2(b) of the Harrison Act, predecessor to the CSA. Ibid. We held that “to call such an order for the use of morphine a physician’s prescription would be so plain a perversion of meaning that no discussion of the subject is required.” Id., at 99-100. Like the Directive, this interprets “prescription” to require medical purpose that is legitimate as a matter of federal law. And the Directive is also assuredly valid insofar as it interprets “legitimate medical purpose” as a matter of federal law to exclude physician-assisted suicide, because that is not only a permissible but indeed the most natural interpretation of that phrase. See Part II, infra.
B
Even if the Regulation merely parroted the statute, and the Directive therefore had to be treated as though it construed the statute directly, see ante, at 257, the Directive would still be entitled to deference under Chevron.. The Court does not take issue with the Solicitor General’s contention that no alleged procedural defect, such as the absence of notice-and-comment rulemaking before promulgation of the Directive, renders Chevron inapplicable here. See Reply Brief for Petitioners 4 (citing Barnhart v. Walton, 535 U. S. 212, 219-222 (2002); 5 U. S. C. § 553(b)(3)(A) (exempting interpretive rules from notice-and-comment rulemaking)). Instead, the Court holds that the Attorney General lacks interpretive authority to issue the Directive at all, on the ground that the explicit delegation provision, 21 U. S. C. §821 (2000 ed., Supp. V), limits his rulemaking authority to “registration and control,” which (according to the Court) are not implicated by the Directive’s interpretation of the prescription requirement. See ante, at 259-262.
Setting aside the implicit delegation inherent in Congress’s use of the undefined term “prescription” in §829, the Court’s *282 reading of “control” in §821 is manifestly erroneous. The Court urges, ante, at 260, that “control” is a term defined in part A of the subchapter (entitled “Introductory Provisions”) to mean “to add a drug or other substance ... to a schedule under part B of this subchapter,” 21 U. S. C. § 802(5) (emphasis added). But §821 is not included in “part B of this subehapter,” which is entitled “Authority to. Control; Standards and Schedules,” and consists of the sections related to scheduling, 21 U. S. C. §§811-814 (2000 ed. and Supp. V), where the statutory definition is uniquely appropriate. Rather, §821 is found in part C of the subchapter, §§821-830, entitled “Registration of Manufacturers, Distributors, and Dispensers of Controlled Substances,” which includes all and only the provisions relating to the “manufacture, distribution, and dispensing of controlled substances,” § 821. The artificial definition of “control” in § 802(5) has no conceivable application to the use of that word in §821. Under that definition, “control” must take a substance as its direct object, see 21 U. S. C. §802(5) (“to add a drug or other substance ... to a schedule”) — and that is how “control” is consistently used throughout part B. See, e.g., §§ 811(b) (“proceedings ... to control a drug or other substance”), 811(c) (“each drug or other substance proposed to be controlled or removed from the schedules”), 811(d)(1) (“If control is required... the Attorney General shall issue an order controlling such drug .. . ”), 812(b) (“Except where control is required ... a drug or other substance may not be placed in any schedule ... ”). In §821, by contrast, the term “control” has as its object, not “a drug or other substance,” but rather the processes of “manufacture, distribution, and dispensing of controlled substances.” It could not be clearer that the-artificial definition of “control” in §802(5) is inapplicable. It makes no sense to speak of “adding the manufacturing, distribution, and dispensing of substances to a schedule.” We do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense. What *283 is obviously intended in §821 is the ordinary meaning of “control” — namely, “[t]o exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb,” Webster’s Second 580. “Control” is regularly used in this ordinary sense elsewhere in part C of the sub-chapter. See, e.g., 21 U.S.C. §§828(a)(1), (b)(1), (d)(1), (e)(1), (h)(1) (“maintenance of effective controls against diversion”); §§ 823(a)(5), (d)(5) (“establishment of effective control against diversion”); § 823(g)(2)(H)(i) (“to exercise supervision or control over the practice of medicine”); § 830(b)(1)(C) (“a listed chemical under the control of the regulated person”); § 830(c)(2)(D) (“chemical control laws”) (emphasis added).
When the word is given its ordinary meaning, the Attorney General’s interpretation of the prescription requirement of §829 plainly “relat[es] to the... control of the... dispensing of controlled substances,” 21 U.S.C. §821 (2000 ed., Supp. V) (emphasis added), since a prescription is the chief requirement for “dispensing” such drugs, see §829. The same meaning is compelled by the fact that §821 is the first section not of part B of the subchapter, which deals entirely with “control” in the artificial sense, but of part C, every section of which relates to the “registration and control of the manufacture, distribution, and dispensing of controlled substances,” §821. See §§822 (persons required to register), 823 (registration requirements), 824 (denial, revocation, or suspension of registration), 825 (labeling and packaging), 826 (production quotas for controlled substances), 827 (rec-ordkeeping and reporting requirements of registrants), 828 (order forms), 829 (prescription requirements), 830 (regulation of listed chemicals and certain machines). It would be peculiar for the first section of this part to authorize rule-making for matters covered by the previous part. The only sensible interpretation of §821 is that it gives the Attorney General interpretive authority over the provisions of part C, all of which “relat[e] to the registration and control of the *284 manufacture, distribution, and dispensing of controlled substances.” These provisions include both the prescription requirement of §829, and the criteria for registration and deregistration of §§823 and 824 (as relevant below, see Part III, infra).[3]
C
In sum, the Directive’s construction of “legitimate medical purpose” is a perfectly valid agency interpretation of its own regulation; and if not that, a perfectly valid agency interpretation of the statute. No one contends that the construction is “plainly erroneous or inconsistent with the regulation,” Bowles v. Seminole Rock & Sand Co., 325 U. S. 410, 414 (1945), or beyond the scope of ambiguity in the statute, see Chevron, 467 U. S., at 843. In fact, as explained below, the Directive provides the most natural interpretation of the Regulation and of the statute. The Directive thus definitively establishes that a doctor’s order authorizing the dispensation of a Schedule II substance for the purpose of assisting a suicide is not a “prescription” within the meaning of §829.
*285 Once this conclusion is established, the other two conclusions in the Directive follow inevitably. Under our reasoning in Moore, writing prescriptions that are illegitimate under §829 is certainly not “in the [usual] course of professional practice” under §802(21) and thus not “authorized by this subchapter” under § 841(a). See 423 U. S., at 138, 140-141. A doctor who does this may thus be prosecuted under § 841(a), and so it follows that such conduct “violates the Controlled Substances Act,” 66 Fed. Reg. 56608. And since such conduct is thus not in “[cjompliance with applicable . . . Federal . . . laws relating to controlled substances,” 21 U. S. C. § 823(f)(4), and may also be fairly judged to “threaten the public health and safety,” § 823(f)(5), it follows that “[s]uch conduct by a physician registered to dispense controlled substances may ‘render his registration ... inconsistent with the public interest’ and therefore subject to possible suspension or revocation under 21 U. S. C. [§] 824(a)(4),” 66 Fed. Reg. 56608 (emphasis added).
II
Even if the Directive were entitled to no deference whatever, the most reasonable interpretation of the Regulation and of the statute would produce the same result. Virtually every relevant source of authoritative meaning confirms that the phrase “legitimate medical purpose”[4] does not include intentionally assisting suicide. “Medicine” refers to “[t]he science and art dealing with the prevention, cure, or alleviation of disease.” Webster’s Second 1527. The use of the word “legitimate” connotes an objective standard of “medicine,” and our presumption that the CSA creates a uniform federal law regulating the dispensation of controlled substances, see Mississippi Band of Choctaw Indians v. Holy- *286 field, 490 U. S. 30,43 (1989), means that this objective standard must be a federal one. As recounted in detail in the memorandum for the Attorney General that is attached as an appendix to the Directive (OLC Memo), virtually every medical authority from Hippocrates to the current American Medical Association (AMA) confirms that assisting suicide has seldom or never been viewed as a form of “prevention, cure, or alleviation of disease,” and (even more so) that assisting suicide is not a “legitimate” branch of that “science and art.” See OLC Memo, App. to Pet. for Cert. 113a-130a. Indeed, the AMA has determined that “ ‘[p]hysician-assisted suicide is fundamentally incompatible with the physician’s role as healer.’” Washington v. Glucksberg, 521 U. S. 702, 731 (1997). “[T]he overwhelming weight of authority in judicial decisions, the past and present policies of nearly all of the States and of the Federal Government, and the clear, firm and unequivocal views of the leading associations within the American medical and nursing professions, establish that assisting in suicide ... is not a legitimate medical purpose.” OLC Memo, supra, at 129a. See also Glucksberg, supra, at 710, n. 8 (prohibitions or condemnations of assisted suicide in 50 jurisdictions, including 47 States, the District of Columbia, and 2 Territories).
In the face of this “overwhelming weight of authority,” the Court’s admission that “[o]n its own, this understanding of medicine’s boundaries is at least reasonable,” ante, at 272 (emphasis added), tests the limits of understatement. The only explanation for such a distortion is that the Court confuses the normative inquiry of what the boundaries of medicine should be — which it is laudably hesitant to undertake— with the objective inquiry of what the accepted definition of “medicine” is. The same confusion is reflected in the Court’s remarkable statement that “[t]he primary problem with the Government’s argument... is its assumption that the CSA impliedly authorizes an executive officer to bar a use simply *287 because it may be inconsistent with one reasonable understanding of medical practice.” Ante, at 272-273 (emphasis added). The fact that many in Oregon believe that the boundaries of “legitimate medicine” should be extended to include assisted suicide does not change the fact that the overwhelming weight of authority (including the 47 States that condemn physician-assisted suicide) confirms that they have not yet been so extended. Not even those of our Eighth Amendment cases most generous in discerning an “evolution” of national standards would have found, on this record, that the concept of “legitimate medicine” has evolved so far. See Roper v. Simmons, 543 U. S. 551, 564-567 (2005).
The Court contends that the phrase “legitimate medical purpose” cannot be read to establish a broad, uniform federal standard for the medically proper use of controlled substances. Ante, at 268. But it also rejects the most plausible alternative proposition, urged by the State, that any use authorized under state law constitutes a “legitimate medical purpose.” (The Court is perhaps leery of embracing this position because the State candidly admitted at oral argument that, on its view, a State could exempt from the CSA’s coverage the use of morphine to achieve euphoria.) Instead, the Court reverse-engineers an approach somewhere between a uniform national standard and a state-by-state approach, holding (with no basis in the CSA’s text) that “legitimate medical purpose” refers to all uses of drugs unrelated to “addiction and recreational abuse.” Ante, at 274. Thus, though the Court pays lipservice to state autonomy, see ante, at 269-271, its standard for “legitimate medical purpose” is in fact a hazily defined federal standard based on its purposive reading of the CSA, and extracted from obliquely relevant sections of the Act. In particular, relying on its observation that the criteria for scheduling controlled substances are primarily concerned with “addiction or abnormal effects on the nervous system,” ante, at 273 (citing 21 *288 U. S. C. §§ 811(c)(7), 812(b), 811(f), 801a), the Court concludes that the CSA’s prescription requirement must be interpreted in light of this narrow view of the statute’s purpose.
Even assuming, however, that the principal concern of the CSA is the curtailment of “addiction and recreational abuse,” there is no reason to think that this is its exclusive concern. We have repeatedly observed that Congress often passes statutes that sweep more broadly than the main problem they were designed to address. “[Statutory prohibitions often go.beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.” Oncale v. Sundowner Offshore Services, Inc., 523 U. S. 75, 79 (1998). See also H. J. Inc. v. Northwestern Bell Telephone Co., 492 U. S. 229, 248 (1989).
The scheduling provisions of the CSA on which the Court relies confirm that the CSA’s “design,” ante, at 269, is not as narrow as the Court asserts. In making scheduling determinations, the Attorney General must not only consider a drug’s “psychic or physiological dependence liability” as the Court points out, ante, at 273 (citing 21 U. S. C. § 811(c)(7)), but must also consider such broad factors as “[t]he state of current scientific knowledge regarding the drug or other substance,” § 811(c)(3), and (most notably) “[w]hat, if any, risk there is to the public health,” § 811(e)(6). If the latter factor were limited to addiction-related health risks, as the Court supposes, it would be redundant of § 811(c)(7). Moreover, in making registration determinations regarding manufacturers and distributors, the Attorney General “shall” consider “such other factors as may be relevant to and consistent with the public health and safety,” §§ 823(a)(6), (b)(5), (d)(6), (e)(5) (emphasis added) — over and above the risk of “diversion” of controlled substances, §§ 823(a)(1), (a)(5), (b)(1), (d)(1), (d)(5), (e)(1). And, most relevant of all, in registering and deregis-tering physicians, the Attorney General “may deny an appli *289 cation for such registration if he determines that the issuance of such registration would be inconsistent with the public interest,” § 823(f); see also § 824(a)(4), and in making that determination “shall” consider “[s]uch other conduct which may threaten the public health and safety,” § 823(f)(5). All of these provisions, not just those selectively cited by the Court, shed light upon the CSA’s repeated references to the undefined term “abuse.” See §§ 811(a)(1)(A), (c)(1), (c)(4), (c)(5); §§ 812(b)(1)(A), (b)(2)(A), (b)(3)(A), (b)(4)(A), (b)(5)(A).
By disregarding all these public-interest, public-health, and public-safety objectives, and limiting the CSA to “addiction and recreational abuse,” the Court rules out the prohibition of anabolic-steroid use for bodybuilding purposes. It seeks to avoid this consequence by invoking the Anabolic Steroids Control Act of 1990, 104 Stat. 4851. Ante, at 273. But the only effect of that legislation is to make anabolic steroids controlled drugs under Schedule III of the CSA. If the only basis for control is (as the Court says) “addiction and recreational abuse,” dispensation of these drugs for bodybuilding could not be proscribed.
Although, as I have described, the Court’s opinion no more defers to state law than does the Directive, the Court relies on two provisions for the conclusion that “[t]he structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States’ police powers,” ante, at 270 — namely, the registration provisions of § 823(f) and the nonpre-emption provision of §903. Reliance on the former is particularly unfortunate, because the Court’s own analysis recounts how Congress amended § 823(f) in 1984 in order to liberate the Attorney General’s power over registration from the control of state regulators. See ante, at 261; 21 U. S. C. § 823(f); see also Brief for Petitioners 34-35. And the nonpre-emption clause is embarrassingly inapplicable, since it merely disclaims field preemption, and affirmatively prescribes federal pre-emption *290 whenever state law creates a conflict.[5] In any event, the Directive does not purport to pre-empt state law in any way, not even by conflict pre-emption — unless the Court is under the misimpression that some States require assisted suicide. The Directive merely interprets the CSA to prohibit, like countless other federal criminal provisions, conduct that happens not to be forbidden under state law (or at least the law of the State of Oregon).
With regard to the CSA’s registration provisions, 21 U. S. C. §§ 828(f), 824(a), the Court argues that the statute cannot fairly be read to “ ‘hide elephants in mouseholes’ ” by delegating to the Attorney General the power to determine the legitimacy of medical practices in “ ‘vague terms or ancillary provisions.’ ” Ante, at 267 (quoting Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 468 (2001)). This case bears not the remotest resemblance to Whitman, which held that “Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.” Ibid, (emphasis added). The Attorney General’s power to issue regulations against questionable uses of controlled substances in no way alters “the fundamental details” of the. CSA. I am aware of only four areas in which the Department of Justice has exercised that power to regulate uses of controlled substances unrelated to “addiction and recreational abuse” as the Court apparently understands that phrase: assisted suicide, aggressive pain management therapy, anabolic-steroid use, and cosmetic weight-loss therapy. See, e. g., In re Harline, 65 Fed. Reg. 5665, 5667 (2000) (weight loss); In re Tecca, 62 Fed. Reg. 12842, 12846 (1997) (anabolic steroids); In re Roth, 60 Fed. Reg. 62262, 62268, 62267 (1995) (pain management). There is no indication that *291 enforcement in these areas interferes with the prosecution of “drug abuse” as the Court understands it. Unlike in Whitman, the Attorney General’s additional power to address other forms of drug “abuse” does absolutely nothing to undermine the central features of this regulatory scheme. Of course it was critical to our analysis in Whitman that the language of the provision did not bear the meaning that respondents sought to give it. See 531 U. S., at 465. Here, for the reasons stated above, the provision is most naturally interpreted to incorporate a uniform federal standard for legitimacy of medical practice.[6]
Finally, respondents argue that the Attorney General must defer to state-law judgments about what constitutes legitimate medicine, on the ground that Congress must speak clearly to impose such a uniform federal standard upon the States. But no line of our clear-statement cases is applicable here. The canon of avoidance does not apply, since the Directive does not push the outer limits of Congress’s commerce power, compare Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159, 172 (2001) (regulation of isolated ponds), with United States v. Sullivan, 332 U. S. 689, 698 (1948) (regulation of labeling of drugs shipped in interstate commerce), or impinge on a core aspect of state sovereignty, cf. Atascadero State Hospital v. Scanlon, 473 U. S. 234, 242 (1985) (sovereign immunity); Gregory v. Ashcroft, 501 U. S. 452, 460 (1991) (qualifications of state government officials). The clear-statement rule based on the presumption against pre-emption does not *292 apply because the Directive does not pre-empt any state law, cf. id., at 456-457; Rusk Prudential HMO, Inc. v. Moran, 536 U. S. 355, 359 (2002). And finally, no clear statement is required on the ground that the Directive intrudes upon an area traditionally reserved exclusively to the States, cf. BFP v. Resolution Trust Corporation, 511 U. S. 531, 544 (1994) (state regulation of titles to real property), because the Federal Government has pervasively regulated the dispensation of drugs for over 100 years. See generally Brief for Pro-Life Legal Defense Fund et al. as Amici Curiae 3-15. It would be a novel and massive expansion of the dear-statement rule to apply it in a commercé case not involving pre-emption or constitutional avoidance, merely because Congress has chosen to prohibit conduct that a State has made a contrary policy judgment to permit. See Sullivan, supra, at 693.
III
Even if the Regulation did not exist and “prescription” in §829 could not be interpreted to require a “legitimate medical purpose,” the Directive’s conclusion that “prescribing, dispensing, or administering federally controlled substances ... by a physician . . . may ‘render his registration . . . inconsistent with the public interest’ and therefore subject to possible suspension or revocation under 21 U. S. C. [§] 824(a)(4),” 66 Fed. Reg. 56608, would nevertheless be unassailable in this Court.
Sections 823(f) and 824(a) explicitly grant the Attorney General the authority to register and deregister physicians, and his discretion in exercising that authority is spelled out in very broad terms. He may refuse to register or deregis-ter if he determines that registration is “inconsistent with the public interest,” 21 U. S. C. § 823(f), after considering five factors, the fifth of which is “[s]uch other conduct which may threaten the public health and safety,” § 823(f)(5). See also In re Arora, 60 Fed. Reg. 4447, 4448 (1995) (“It is well established that these factors are to be considered in the disjunc *293 tive, i. e., the Deputy Administrator may properly rely on any one or a combination of factors, and give each factor the weight he deems appropriate”). As the Court points out, these broad standards were enacted in the 1984 amendments for the specific purpose of freeing the Attorney General’s discretion over registration from the decisions of state authorities. See ante, at 261.
The fact that assisted-suicide prescriptions are issued in violation of § 829 is of course sufficient to support the Directive’s conclusion that issuing them may be cause for deregis-tration: such prescriptions would violate the fourth factor of § 823(f), namely, “[compliance with applicable... Federal... laws relating to controlled substances,” 21 U. S. C. § 823(f)(4). But the Attorney General did not rely solely on subsection (f)(4) in reaching his conclusion that registration would be “inconsistent with the public interest”; nothing in the text of the Directive indicates that. Subsection (f)(5) (“[sjuch other conduct which may threaten the public health and safety”) provides an independent, alternative basis for the Directive’s conclusion regarding deregistration — provided that the Attorney General has authority to interpret “public interest” and “public health and safety” in § 823(f) to exclude assisted suicide.
Three considerations make it perfectly clear that the statute confers authority to interpret these phrases upon the Attorney General. First, the Attorney General is solely and explicitly charged with administering the registration and deregistration provisions. See §§ 823(f), 824(a). By making the criteria for such registration and deregistration such obviously ambiguous factors as “public interest” and “public health and safety,” Congress implicitly (but clearly) gave the Attorney General authority to interpret those criteria— whether or not there is any explicit delegation provision in the statute. “Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own *294 construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” Chevron, 467 U. S., at 844. The Court’s exclusive focus on the explicit delegation provisions is, at best, a fossil of our pre-Chevron era; at least since Chevron, we have not conditioned our deferral to agency interpretations upon the existence of explicit delegation provisions. United States v. Mead Corp., 538 U. S. 218, 229 (2001), left this principle of implicit delegation intact.
Second, even if explicit delegation were required, Congress provided it in §821, which authorizes the Attorney General to “promulgate rules and regulations ... relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances . . . .” (Emphasis added.) Because “dispensing” refers to the delivery of a controlled substance “pursuant to the lawful order of, a practitioner,” 21 U. S. C. §802(10), the deregistration of such practitioners for writing impermissible orders “relat[es] to the registration ... of the ... dispensing” of controlled substances, 21 U. S. C. §821 (2000 ed., Supp. V).
Third, §821 also gives the Attorney General authority to promulgate rules and regulations “relating to the ... control of the . . . dispensing of controlled substances.” As discussed earlier, it is plain that the ordinary meaning of “control” must apply to § 821, so that the plain import of the provision is to grant the Attorney General rulemaking authority over all the provisions of part C of the CSA, §§ 821-830 (main ed. and Supp. 2005). Registering and deregistering the practitioners who issue the prescriptions necessary for lawful dispensation of controlled substances plainly “relat[es] to the . . . control of the . . . dispensing of controlled substances.” §821 (Supp. 2005).
The Attorney General is thus authorized to promulgate regulations interpreting §§ 823(f) and 824(a), both by implicit delegation in § 823(f) and by two grounds of explicit delegation in §821. The Court nevertheless holds that this triply *295 unambiguous delegation cannot be given full effect because “the design of the statute,” ante, at 265, evinces the intent to grant the Secretary of Health and Human Services exclusive authority over scientific and medical determinations. This proposition is not remotely plausible. The Court cites as authority for the Secretary’s exclusive authority two specific areas in which his medical determinations are said to be binding on the Attorney General — with regard to the “scientific and medical evaluation” of a drug’s effects that precedes its scheduling, § 811(b), and with regard to “the appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts,” 42 U. S. C. § 290bb-2a; see also 21 U. S. C. § 823(g) (2000 ed. and Supp. II). See ante, at 265-266. Far from establishing a general principle of Secretary supremacy with regard to all scientific and medical determinations, the fact that Congress granted the Secretary specifically defined authority in the areas of scheduling and addiction treatment, without otherwise mentioning him in the registration provisions, suggests, to the contrary, that Congress envisioned no role for the Secretary in that area — where, as we have said, interpretive authority was both implicitly and explicitly conferred upon the Attorney General.
Even if we could rewrite statutes to accord with sensible “design,” it is far from a certainty that the Secretary, rather than the Attorney General, ought to control the registration of physicians. Though registration decisions sometimes require judgments about the legitimacy of medical practices, the Department of Justice has seemingly had no difficulty making them. See In re Harline, 65 Fed. Reg. 5665; In re Tecca, 62 Fed. Reg. 12842;. In re Roth, 60 Fed. Reg. 62262. But unlike decisions about whether a substance should be scheduled or whether a narcotics addiction treatment is legitimate, registration decisions are not exclusively, or even primarily, concerned with “medical [and] scientific” factors. See 21 U. S. C. § 823(f). Rather, the decision to register, or *296 to bring an action to deregister, an individual physician implicates all the policy goals and competing enforcement priorities that attend any exercise of prosecutorial discretion. It is entirely reasonable to think (as Congress evidently did) that it would be easier for the Attorney General occasionally to make judgments about the legitimacy of medical practices than it would be for the Secretary to get into the business of law enforcement. It is, in other words, perfectly consistent with an intelligent “design of the statute” to give the Nation’s chief law enforcement official, not its chief health official, broad discretion over the substantive standards that govern registration and deregistration. That is especially true , where the contested “scientific and medical” judgment at issue has to do with the legitimacy of physician-assisted suicide, which ultimately rests, not on “science” or “medicine,” but on a naked value judgment. It no more depends upon a “quintessentially medical judgmen[t],” ante, at 267, than does the legitimacy of polygamy or eugenic infanticide. And it requires no particular medical training to undertake the objective inquiry into how the continuing traditions of Western medicine have consistently treated this subject. See OLC Memo, App. to Pet. for Cert. 113a-130a. The Secretary’s supposedly superior “medical expertise” to make “medical judgments,” ante, at 266, is strikingly irrelevant to the case at hand.
The Court also reasons that, even if the CSA grants the Attorney General authority to interpret § 823(f), the Directive does not purport to exercise that authority, because it “does not undertake the five-factor analysis” of § 823(f) and does not “on its face purport to be an application of the registration provision in § 823(f).” Ante, at 261 (emphasis added). This reasoning is sophistic. It would be improper — indeed, impossible — for the Attorney General to “undertake the five-factor analysis” of § 823(f) and to “appl[y] the registration provision” outside the context of an actual enforcement proceeding. But of course the Attorney Gen *297 eral may issue regulations to clarify his interpretation of the five factors, and to signal how he will apply them in future enforcement proceedings. That is what the Directive plainly purports to do by citing § 824(a)(4), and that is why the Directive’s conclusion on deregistration is couched in conditional terms: “Such conduct by a physician . . . may ‘render his registration . . . inconsistent with the public interest’ and therefore subject to possible suspension or revocation under 21 U. S. C. [§] 824(a)(4).” 66 Fed. Reg. 56608 (emphasis added).
It follows from what we have said that the Attorney General’s authoritative interpretations of “public interest” and “public health and safety” in § 823(f) are subject to Chevron deference. As noted earlier, the Court does not contest that the absence of notiee-and-comment procedures for the Directive renders Chevron inapplicable. And there is no serious argument that “Congress has directly spoken to the precise question at issue,” or that the Directive’s interpretations of “public health and safety” and “inconsistent with the public interest” are not “permissible.” Chevron, 467 U. S., at 842-843. On the latter point, in fact, the condemnation of assisted suicide by 50 American jurisdictions supports the Attorney General’s view. The Attorney General may therefore weigh a physician’s participation in assisted suicide as a factor counseling against his registration, or in favor of deregistration, under § 823(f).
In concluding to the contrary, the Court merely presents the conclusory assertion that “it is doubtful the Attorney General could cite the ‘public interest’ or ‘public health’ to deregister a physician simply because he deemed a controversial practice permitted by state law to have an illegitimate medical purpose.” Ante, at 264. But why on earth not? — especially when he has interpreted the relevant statutory factors in advance to give fair warning that such a practice is “inconsistent with the public interest.” The Attorney General’s discretion to determine the public interest in this *298 area is admittedly broad — but certainly no broader than other congressionally conferred executive powers that we have upheld in the past. See, e. g., National Broadcasting Co. v. United States, 319 U. S. 190, 216-217 (1943) (“public interest”); New York Central Securities Corp. v. United States, 287 U. S. 12, 24-25 (1932) (same); see also Mistretta v. United States, 488 U. S. 361, 415-416 (1989) (Scalia, J., dissenting).
* * *
In sum, the Directive’s first conclusion — namely, that physician-assisted suicide is not a “legitimate medical purpose” — is supported both by the deference we owe to the agency’s interpretation of its own regulations and by the deference we owe to its interpretation of the statute. The other two conclusions — (2) that prescribing controlled drugs to assist suicide violates the CSA, and (3) that such conduct is also “inconsistent with the public interest” — are inevitable consequences of that first conclusion. Moreover, the third conclusion, standing alone, is one that the Attorney General is authorized to make.
The Court’s decision today is perhaps driven by a feeling that the subject of assisted suicide is none of the Federal Government’s business. It is easy to sympathize with that position. The prohibition or deterrence of assisted suicide is certainly not among the enumerated powers conferred on the United States by the Constitution, and it is within the realm of public morality (bonos mores) traditionally addressed by the so-called police power of the States. But then, neither is prohibiting the recreational use of drugs or discouraging drug addiction among the enumerated powers. From an early time in our national history, the Federal Government has used its enumerated powers, such as its power to regulate interstate commerce, for the purpose of protecting public morality — for example, by banning the interstate shipment of lottery tickets, or the interstate transport of women for immoral purposes. See Hoke v. United States, *299 227 U. S. 308, 321-323 (1913); Lottery Case, 188 U. S. 321, 356 (1903). Unless we are to repudiate a long and well-established principle of our jurisprudence, using the federal commerce power to prevent assisted suicide is unquestionably permissible. The question before us is not whether Congress can do this, or even whether Congress should do this; but simply whether Congress has done this in the CSA. I think there is no doubt that it has. If the term “legitimate medical purpose” has any meaning, it surely excludes the prescription of drugs to produce death.
For the above reasons, I respectfully dissent from the judgment of the Court.

 To be sure, this acknowledgment did not go far enough, because it overlooked the significance of the word “legitimate,” which is most naturally understood to create an objective, federal standard for appropriate medical uses. See Mississippi Band of Choctaw Indians v. Holy field, 490 U. S. 30, 43 (1989) (“We start... with the general assumption that in the absence of a plain indication to the contrary,.. . Congress when it enacts a statute is not making the application of the federal act dependent on state law” (internal quotation marks omitted)).

 The only place outside 21 U. S. C. §801 in which the statute uses the phrase “legitimate medical purpose” is in defining the phrase “valid prescription” for purposes of the reporting requirements that apply to mail orders of regulated substances. See §830(b)(3)(A)(ii). The Regulation did not “parrot” this statutory section, because the Regulation was adopted in 1971 and the statutory language was added in 2000. See Brief for Petitioners 17 (citing the Children’s Health Act of 2000, §3652, 114 Stat. 1239, 21 U. S. C. § 830(b)(3)). But even if the statutory language had predated the Regulation, there would be no “parroting” of that phrase. In using the word “prescription” without definition in the much more critical §829, Congress left the task of resolving any ambiguity in that word, used in that context, to the relevant executive officer. That the officer did so by deeming relevant a technically inapplicable statutory definition contained elsewhere in the statute does not make him a parrot. He has given to the statutory text a meaning it did not explicitly — and perhaps even not necessarily — contain.

 The Court concludes that “[e]ven if ‘control’ in §821 were understood to signify something other than its statutory definition, it would not support the Interpretive Rule.” Ante, at 260. That conclusion rests upon a misidentification of the text that the Attorney General, pursuant to his “control” authority, is interpreting. No one argues that the word “control” in §821 gives the Attorney General “authority to define diversion based on his view of legitimate medical practice,” ibid. Rather, that word authorizes the Attorney General to interpret (among other things) the “prescription” requirement of §829. The question then becomes whether the phrase “legitimate medical purpose" (which all agree is included in “prescription”) is at least open to the interpretation announced in the Directive. See Chevron U.S.A Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843 (1984). And of course it is — as the Court effectively concedes two pages earlier: “All would agree, we should think, that the statutory phrase ‘legitimate medical purpose’ is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense.” Ante, at 258 (citing Chevron).

 This phrase appears only in the Regulation and not in the relevant section of the statute. But as pointed out earlier, the Court does not contest that this is the most reasonable interpretation of the section— regarding it, indeed, as a mere “parroting” of the statute.

 Title 21 U. S. C. §903 reads, in relevant part, as follows: “No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter ... unless there is a positive conflict...

 The other case cited by the Court, FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120 (2000), is even more obviously inapt. There we relied on the first step of the Chevron analysis to determine that Congress had spoken to the precise issue in question, impliedly repealing the grant of jurisdiction on which the Food and Drug Administration relied. 529 U. S., at 160-161. Here, Congress has not expressly or impliedly authorized the practice of assisted suicide, or indeed “spoken directly” to the subject in any way beyond the text of the CSA.